IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

SEAN PHILIP SCHUYLER,          )     CIVIL 17-00277 LEK-KSC
                               )
          Plaintiff,           )
                               )
     vs.                       )
                               )
NANCY A. BERRYHILL, Acting     )
Commissioner of Social         )
Security,                      )
                               )
          Defendant.           )
_____)


**ORDER GRANTING PLAINTIFF'S APPEAL AND REVERSING
THE ADMINISTRATIVE LAW JUDGE'S OCTOBER 15, 2015 DECISION**

          Before the Court is Plaintiff Sean Philip Schuyler's
("Plaintiff") Complaint for Review of Supplemental Security
Income Determination ("Complaint"), filed on June 11, 2017, in
which he appeals from Administrative Law Judge Jeffrey Hatfield's
("ALJ") October 15, 2015 Decision ("Appeal").  The ALJ issued the
Decision after conducting a hearing on July 8, 2015.
[Administrative Record ("AR") at 15.[1]]  The ALJ ultimately
concluded Plaintiff was not disabled, for purposes of the Social
Security Act, since February 26, 2013.  [Decision, AR at 31.]

          On November 6, 2017, Plaintiff filed his Opening Brief.
[Dkt. no. 14.]  Defendant Nancy A. Berryhill, Acting Commissioner
of Social Security ("the Commissioner"), filed her Answering
Brief on January 8, 2018, and Plaintiff filed his Reply Brief on

_____
          [1] The Decision, including the Notice of Decision –
Unfavorable and the List of Exhibits, is AR pages 12-36.

February 5, 2018.  [Dkt. nos. 15, 18.]  This Court heard oral argument on April 9, 2018 and issued an entering order ruling on Plaintiff's Appeal on June 29, 2018.  [Dkt. no. 20.]  The instant Order supersedes that entering order.  Plaintiff's Appeal is granted, and the ALJ's Decision is reversed.  The case is remanded to the ALJ for the payment of benefits.

### BACKGROUND

On January 9, 2013, Plaintiff filed a Title II application for disability insurance benefits, but the application was denied because he did not have a sufficient earnings record to be eligible for Title II benefits.  On February 26, 2013, Plaintiff protectively filed an application for supplemental security income ("SSI"), alleging he was disabled as of November 4, 2011.  Plaintiff later amended the alleged onset date to November 3, 2009.  Plaintiff's claim was denied, initially and on reconsideration.  On June 17, 2014, Plaintiff filed a written request for a hearing.  At the July 8, 2015 hearing, Plaintiff was represented by his current counsel. Plaintiff, Michael Wayne Schuyler – Plaintiff's father, and Alice L. Thomas – an impartial vocational expert ("VE"), testified at the hearing.  Tracy R. Gordy, M.D., an impartial medical expert, was scheduled to testify, but did not do so. Dr. Gordy's responses to post-hearing interrogatories were included in the record.  [Decision, AR at 15.]

In the instant Appeal, Plaintiff does not dispute the ALJ's findings in step one through three of the five-step sequential analysis to determine whether a claimant is disabled. Thus, the ALJ's findings as to those steps are only briefly discussed here.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since February 26, 2013. For two years prior to the hearing, Plaintiff helped at a tattoo shop on a regular basis, in what the shop owner – Peggy Sucher – described as "a volunteer position." [Decision, AR at 17.] Plaintiff received tips of approximately $100.00-$150.00 per month and apparently received some free tattoos during the two-year period. The ALJ found Plaintiff's time at the tattoo shop did not constitute substantial gainful employment. [Id.]

At step two, the ALJ found Plaintiff had a mental impairment that was considered severe – schizophrenia. The ALJ also found Plaintiff did not have any severe physical impairments. [Id. at 18.]

At step three, the ALJ found Plaintiff's impairment did not meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [Id.]

At step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC")

to perform a full range of work at all exertional
levels but with the following nonexertional
limitations: he would be off-task 5% of the
workday[2] due to psychological symptomatology; he
is limited to occasional changes in work setting;
he cannot perform production rate pace work (that
is, no traditional type assembly line work where
another employee's production would be dependent
on the claimant's immediate prior performance); he
is limited to occasional interaction with the
public, but could tolerate frequent interaction
with supervisors and coworkers; and he would need
to avoid even moderate exposure to hazardous
machinery and unprotected heights.

[Id. at 20 (emphasis omitted).]

In considering Plaintiff's symptoms to determine

Plaintiff's RFC, the ALJ looked at: whether Plaintiff's mental

impairment could reasonably be expected to produce his symptoms;

and the extent to which Plaintiff's symptoms limited his

functioning.  [Id. at 21.]  The ALJ noted Plaintiff testified he

could not work because: his symptoms included auditory

hallucinations that generally went on for half of his day,

regardless of whether he is having a good day or a bad day; he

needs breaks at least once an hour to regain his composure when

his symptoms increase; he usually did not stay at the tattoo shop

for eight hours in one day; on his bad days (which usually occur

once a week), he does not stay at the tattoo shop for more than

an hour; he is paranoid, dislikes people, and finds it difficult

to get along with others, especially persons in authority;

---

2 According to Plaintiff, five percent of the workday is the
equivalent of twenty four minutes.  [Opening Brief at 2.]

4

medications do not work for him because of their side effects; and he was becoming increasingly agitated, depressed, and isolated. [Id. (citing Exs. 4E, 8E, 11E, 16E).[3]] The ALJ found Plaintiff's impairments could reasonably be expected to cause his symptoms, but his "statements concerning the intensity, persistence and limiting effects of these symptoms [were only] partly credible." [Id. at 21-22.]

The ALJ noted that, at his alleged onset date of November 3, 2009, Plaintiff was a straight-A student at Sierra College. He previously attended the University of California - Davis ("UC Davis"), but dropped out because of his symptoms. [Id. at 22.] From November 3, 2009 to May 25, 2010, Jong Yoon, M.D., a psychiatrist at UC Davis's EDAPT Clinic, rated Plaintiff's global assessment of functioning ("GAF") at sixty.[4]

_____

[3] Exhibit 4E is a Function Report – Adult, dated June 5, 2013, prepared by Plaintiff; [AR at 229-36;] Exhibit 8E is a Disability Report – Appeal, dated March 10, 2014, prepared by Plaintiff's father; [AR at 248-53;] Exhibit 11E is a Disability Report – Appeal, dated June 17, 2014, prepared by Plaintiff's counsel; [AR at 258-63;] and Exhibit 16E is an email string between Plaintiff and another person, who is referred to as "Rob," from December 1 to 7, 2014, discussing how to cope with the symptoms of schizophrenia, [AR at 284-87; Court Transcript Index at 2].

[4] The GAF Scale measures "the clinician's judgment of the individual's overall level of functioning" as to "psychological, social, and occupational functioning," but not "impairment in functioning due to physical (or environmental) limitations." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) ("DSM-IV-TR") at 32. The GAF Scale ranges from 0-100. A score between 51-60
(continued...)

Dr. Yoon's diagnosis of Plaintiff's auditory hallucinations and fixed delusions supported a diagnosis on the schizophrenia spectrum, "'warrant[ing] more aggressive use of neuroleptic.'" [Id. (quoting Ex. 6F).[5]]  Dr. Yoon's assessment was consistent until January 4, 2011, when he noted Plaintiff "was responding well to a higher dose of Abilify with 'fairly good control of psychosis.'"  [Id. (quoting Ex. 6F).]  On April 5, 2011, Dr. Yoon noted Plaintiff's psychosis was "'stable,'" and his auditory hallucinations and paranoia were "'recurrent . . . but at low levels and with minimal effect on function.'"  [Id. (quoting Ex. 6F).]  Plaintiff complained of "'free floating anxiety which [wa]s not related to any specific thought or triggers'" and frequent "'depress[ion] for no apparent reason,'" but, according to Plaintiff, he was still going to class and getting A's.  [Id. (quoting Ex. 6F).]  Dr. Yoon last saw Plaintiff on July 12, 2011. He noted Plaintiff's psychosis had recently gotten worse because

_____

[4] (...continued)
represents "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. at 34 (emphases omitted).  However, the GAF scale has been replaced by another global measure of disability.  See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-V") at 16.

[5] Exhibit 6F is a collection of Progress Notes, dated November 3, 2009 to July 12, 2011, from the EDAPT Clinic.  [AR at 387-431.]  The Decision does not cite any specific pages of Exhibit 6F.

of breaking up with his girlfriend and attending his aunt's funeral, but "'this worsening [wa]s remitting on its own.'" [Id. (quoting Ex. 6F).]

Plaintiff moved to Hawai`i and has been under the care of psychiatrist Ethan Pien, M.D., since September 2, 2011. When Dr. Pien first saw Plaintiff, Dr. Pien considered him "stable on Abilify, without side effects." [Id. (quoting Ex. 1F/11).[6]] Plaintiff had auditory hallucinations two to three times a day, but said they "were not bothersome and no longer constant." [Id. (quoting Ex. 1F/11).] He was anxious around law enforcement, and he occasionally took Propanolol for anxiety, primarily his anxiety around law enforcement and social anxiety. [Id. (citing Ex. 1F/11).] In spite of these symptoms, which Dr. Pien described as "'residual,'" Plaintiff reported "'feel[ing] highly functional,'" looking for a job in retail, and hoping to go back to school. [Id. (quoting Ex. 1F/11).] Dr. Pien rated Plaintiff's GAF at sixty two.[7] [Id. (quoting Ex. 1F/11).] Dr. Pien's assessments from October 10, 2011 through early 2012

---

[6] Exhibit 1F is a collection of Dr. Pien's Office Treatment Records: Psychotherapy, dated September 2, 2011 to March 15, 2013. [AR at 349-60.] Many of the ALJ's citations to Exhibit 1F do not include a specific page number.

[7] A GAF score between 61-70 represents "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphases omitted).

remained largely the same. Plaintiff was looking for work, and
his anxiety and paranoia were better than when he was living in
California. [<u>Id.</u> at 22-23 (citing Ex. 1F).] On December 16,
2011, Dr. Pien noted Plaintiff said he was hearing voices twice a
day, and the voices were "'mild.'" [<u>Id.</u> at 23 (citing Ex. 1F).]
On February 16, 2012, Plaintiff told Dr. Pien he was "doing
'better and better'" and planning to go to community college,
and, on April 16, 2012, Dr. Pien noted Plaintiff was doing well.
[<u>Id.</u> (citing Ex. 1F).] At both visits, Dr. Pien noted Plaintiff
"did not seem to be responding to internal stimuli," and Dr. Pien
continued to rate Plaintiff at a GAF of sixty two. [<u>Id.</u> (citing
Ex. 1F).]

Plaintiff told Dr. Pien he stopped taking his
psychotropic medications in February 2012 because he believed
they hurt more than they helped, and he "'want[ed] a chance to be
himself.'" [<u>Id.</u> (citing Ex. 1F/4, 3F/2).[8]] Plaintiff reported
losing weight, "becom[ing] much sharper cognitively, [and having]
better memory, energy, motivation and enjoyment." [<u>Id.</u> (citing
Ex. 1F).] Plaintiff also reported increased delusions, but
stated he was learning to cope with his symptoms without
medications. He did not appear to be responding to internal

---

[8] Exhibit 3F is the Treating Source Statement: Assessment of
Claimant, dated October 2, 2013, from Antoine Cazin, M.D. [AR at
372-77.]

stimuli, and Dr. Pien rated Plaintiff at a GAF of fifty.[9] [Id. (citing Ex. 1F).]  At both his November 9, 2012 session and his December 7, 2012 session with Dr. Pien, Plaintiff exhibited "circumstantial thought processes." [Id. (citing Ex. 1F).]  At the December session, Plaintiff stated he was planning to look for a job the following month. [Id. (citing Ex. 1F).]

On January 15, 2013, Plaintiff told Dr. Pien he applied for approximately five part-time jobs.  Dr. Pien noted Plaintiff's "thought process was linear and goal directed for the most, a bit tangential at times, and noted no abnormal/psychotic thoughts." [Id. (citing Ex. 1F).]  Plaintiff filed his SSI application on February 26, 2013.  By his March 15, 2013 session, Plaintiff had not secured employment but planned to resume his job search soon.  Dr. Pien still rated Plaintiff's GAF at fifty, but, according to Plaintiff, his schizophrenia symptoms had decreased, and he was "'feeling more health [sic] in body and mind, less anxious, more confident about being able to hold a job.'" [Id. (citing Ex. 1F).]

On July 2, 2013, Plaintiff underwent a consultive examination by William Marks, Ph.D.  Plaintiff told Dr. Marks he was having daily auditory hallucinations and some visual

_____

[9] A score between 41-50 represents "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphases omitted).

hallucinations, although the ALJ noted that, during testimony, Plaintiff denied having visual hallucinations. According to Plaintiff, he had difficulty sleeping, was constantly pacing or moving, and would pull his hair and hit himself. At the time of Dr. Marks's evaluation, Plaintiff still was not taking psychotropic medication. [Id. (citing Ex. 2F).[10]] Plaintiff told Dr. Marks he: often visited friends and neighbors; occasionally went out with family and friends; enjoyed walking, soccer, working out twice a week, and listening to music; and occasionally participated in a support group. [Id. at 26 (citing Ex. 2F).] Based on Plaintiff's performance during the evaluation, Dr. Marks found Plaintiff: was able to understand, remember, and carry out simple instructions; had "'little or no problems with attention and/or concentration'"; only occasionally needed instructions repeated; was not "unusually physically active, distractible, or impulsive"; did not exhibit any "functional mathematical impairment"; and had an overall intelligence quotient score of 102 (in the 55th percentile), although his scores varied widely – as high as the 82nd percentile on the verbal comprehensive index and as low as the 18th percentile on the speed processing index. [Id. at 23-24 (quoting & citing Ex. 2F).] Dr. Marks noted Plaintiff's

_____

[10] Exhibit 2F is Dr. Marks's psychological evaluation of Plaintiff. [AR at 361-71.]

responses during the examination suggested Plaintiff may have
poor interpersonal skills because he was suspicious and
distrustful of others and had difficulty with authority, but
Dr. Marks found Plaintiff could engage in minimal contact with
others.  Dr. Marks also found Plaintiff was able to speak clearly
and intelligibly and was able to present relevant thoughts in a
simple manner.  [Id. at 26 (citing Ex. 2F).]  Dr. Marks opined
Plaintiff "appeared able to adapt to a low demand entry-level
job, though consistency might be an issue," and Plaintiff "would
benefit from working with others who understand his difficulties,
offer minimal contact and would be willing to work with him in
resolving his concerns."  [Id. at 24 (citing Ex. 2F).]

        As to Dr. Marks's suggestion that Plaintiff should have
"a supportive work setting," the ALJ found "the evidence as a
whole is not entirely persuasive in this regard," and Plaintiff's
limitations could be addressed by reducing stressors, including
minimal public contact, only occasional setting changes, and no
production work.  [Id. at 26.]  The ALJ disagreed with
Dr. Marks's opinion that Plaintiff may "have difficulties with
consistent performance in job performance, interaction and
attendance," because this was not apparent during Plaintiff's
examination with Dr. Marks, and was contrary to the ALJ's view of
medical records, which showed Plaintiff's improvement.  [Id.
(quoting Ex. 2F).]

The reviewing psychological consultants from the state agency ("State Psychological Consultants") also found Plaintiff could: understand and remember both simple instructions and detailed instructions; carry out work instructions; "maintain adequate attendance and sustain an ordinary routine without special supervision"; adapt to routine changes at work; interact with co-workers and supervisors, if "in a work setting that has limited demands for social interaction." [Id. at 24 (citing Ex. 3A).[11]] In a response to written interrogatories, Dr. Gordy opined Plaintiff could "do 'simple repetitive work, some detailed work and probably some complex' work, can interact with coworkers, and can interact with supervisors to a limited extent." [Id. at 24-25 (citing Ex. 11F).[12]] Dr. Gordy acknowledged Plaintiff's prior difficulties with authority figures, but noted Plaintiff had satisfactory interactions with his therapists. [Id. at 25 (citing Ex. 11F).] Plaintiff argued Dr. Gordy failed to address all relevant aspects of Dr. Marks's assessment and may not have considered the statements by the

---

[11] Exhibit 3A is Plaintiff's Disability Determination Explanation on reconsideration ("Reconsideration DDE"), dated May 1, 2014. [AR at 92-105.] Part of the Reconsideration DDE was prepared by N. Shibuya, M.D., and part was prepared by D. Lam, Ph.D. [Exh. 3A/7 (AR at 98); Exh. 3A/9 (AR at 100).]

[12] Exhibit 11F is Dr. Gordy's response to medical interrogatories, dated August 7, 2015. [AR at 463-72.]

owner of the tattoo shop about the nature of the time Plaintiff spent there, but the ALJ rejected these arguments.  [Id.]

The ALJ noted Dr. Marks's opinions were consistent with Dr. Gordy's, as well as those of the State Psychological Consultants.  All of them found Plaintiff had "generally moderate restrictions in social function and/or concentration, persistence and pace."  [Id. at 24.]  The ALJ accorded "some weight" to these assessments because the findings of moderate restrictions in functioning were "supported by the record including findings from the mental status examinations, the psychological test results and the evidence of [Plaintiff's] wide range of activities of daily living."  [Id. (citing SSR 96-2p).]

The ALJ also noted that, although Dr. Pien assessed Plaintiff's GAF at fifty, Dr. Pien's records indicated Plaintiff showed consistent improvement, without medication.  On September 27, 2013, Dr. Pien noted that, since May 2013, Plaintiff had been spending his days at the front desk of the tattoo shop, and was "'[d]oing well there.'"  [Id. at 25 (alteration in Decision) (quoting Ex. 4F).[13]]  On December 12, 2013, Plaintiff told Dr. Pien he still heard voices, but was able to tune them out, and he felt comfortable at the tattoo shop. Dr. Pien noted Plaintiff's "social and occupational functioning

---

[13] Exhibit 4F is Dr. Pien's Office Treatment Records: Psychotherapy, dated from September 27, 2013 to January 23, 2014. [AR at 378-81.]

[was] 'gradually improving.'" [Id. (quoting Ex. 4F).] On
January 23, 2014, Dr. Pien noted Plaintiff was still able to
block out his auditory hallucinations, "was functioning well at
his job, and hoping to start ballet, soccer and swimming." [Id.
(citing Ex. 4F).[14]] Further, Plaintiff "had linear and goal
directed thought processes, 'normal' associations, and moderate
judgment and insight," with no detected abnormal/psychotic
thoughts. [Decision, AR at 26 (quoting Ex. 4F).] On April 17
and October 27, 2014, Dr. Pien also noted Plaintiff: had no
detected abnormal/psychotic thoughts; said it was easier to
ignore the auditory hallucinations; and was "'gradually
improving'" in his "'social and occupational functioning.'" [Id.
(quoting Ex. 7F).[15]]

The ALJ gave greater weight to Dr. Pien's findings that
Plaintiff was stable and improving, as shown by his activities of
daily living and his testimony before the ALJ. [Id. at 27.]

The ALJ emphasized that, as of January 29, 2015 and
February 26, 2015, Plaintiff was spending approximately thirty
two hours per week volunteering at the tattoo shop. At the
February 26 session, Plaintiff reported he was "learning a lot
skills and knowledge" at the tattoo shop, and it was becoming

---

[14] Dr. Pien stated Plaintiff was "[f]unctioning well full
time at job." [Exh. 4F/1 (AR at 378).]

[15] Exhibit 7F is Dr. Pien's Progress Notes, dated from
April 17, 2014 to May 21, 2015. [AR at 432-38.]

easier to cope with his symptoms, and Dr. Pien noted Plaintiff continued to improve while off of his medication. [Id. (citing Exs. 7F/5, 11F).] At the February 26 session, as well as during sessions on March 26, April 23, and May 21, 2015, Dr. Pien noted Plaintiff was stable and discussed his job options. At the May 21 session, Dr. Pien and Plaintiff discussed Plaintiff's "growing confidence." [Id. (citing Ex. 11F); Exh. 7F/1 (AR at 432).]

The ALJ considered statements by the owner of the tattoo shop and Plaintiff's father that Plaintiff: does not have set hours or duties at the shop; decides what time to come in and what to do; and takes a break of approximately ten minutes once or twice an hour "to compose himself or do his own thing." [Decision, AR at 27 (citing Ex. 19E).[16]] The ALJ found these statements had limited persuasive value in light of the other evidence in the record. As to the issue of Plaintiff's breaks, the ALJ stated there was no indication Plaintiff needed such a break during Dr. Marks's examination, and Dr. Pien never stated Plaintiff was easily distracted, restless, or otherwise displayed "psychomotor agitation." [Id.]

On June 27, 2015, Piyush Tiwari, M.D., evaluated Plaintiff and "assessed marked limitations in categories across

---

[16] Exhibit 19E is a letter, dated June 12, 2015, to the Social Security Administration from Peggy Sucher, the owner and operator of the Tattoo Hawaii Studio. [AR at 295.]

multiple areas of concentration, persistence and pace and in social function, and with regard to episodes of deterioration." [Id. (some citations omitted) (citing Ex. 9F).[17]] Dr. Tiwari also rated Plaintiff's GAF at forty.[18] [Id.] The ALJ only gave Dr. Tiwari's opinions limited weight because Dr. Tiwari's "assessment consisted of checking boxes on a three-page form, . . . he did not cite detailed clinical findings, or provide any rationale or discussion to support his assessment," and was "not consistent with the other mental health evidence of record including the clinical findings and psychological test results." [Id. at 27-28 (some citations omitted) (citing SSR 96-2p).]

The ALJ noted Alan Koike, M.D., opined Plaintiff's schizophrenia rendered him totally disabled and unable to work. Dr. Koike noted Plaintiff had difficulty "initiating tasks, maintaining focus and simple problem solving, such as with mowing the lawn, raking leaves or trimming hedges," and was "easily overwhelmed, . . . often leaving a social situation to [be] by

---

[17] Exhibit 9F is Dr. Tiwari's Mental Health Questionnaire. [AR at 449-51.]

[18] A score between 31-40 represents "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . . )." DSM-IV-TR at 34 (emphases omitted).

himself." [Id. at 28.[19]]  The ALJ discounted Dr. Koike's opinion

because: Dr. Koike is Plaintiff's uncle; Dr. Koike based his

opinion on personal observations, having never performed a formal

psychiatric evaluation of Plaintiff; and a psychiatrist's

statement that a claimant is disabled or unable to work does not

necessarily mean the claimant will be found disabled under the

Social Security Act.  [Id. (citing SSR 96-2p).]

The ALJ found Dr. Pien's records and Plaintiff's

volunteer work at the tattoo shop for the last two years before

the hearing showed Plaintiff was capable of "frequent interaction

with those with whom he has some familiarity, like coworkers and

supervisors" and "occasional interaction with the general

public."  [Id.]  Plaintiff's father testified Plaintiff was "a

'high functioning' schizophrenic."  [Id.]  While the owner of the

tattoo shop accommodated Plaintiff's condition by allowing him a

flexible schedule and extending leniency, and although Plaintiff

still had symptoms requiring ongoing monitoring, the ALJ found

"there is well supported mental health opinion showing the

claimant is fairly capable despite his symptoms."  [Id.]

Plaintiff had family support, but did "a lot for himself in terms

---

[19] Dr. Koike's one-page letter addressed "To Whom It May
Concern," with a nine-page Curriculum Vitae, is Exhibit 8F.  [AR
at 432-38.]  He is a psychiatrist and a Clinical Professor in the
University of California, Davis School of Medicine's Department
of Psychiatry and Behavioral Sciences, as well as the medical
director of the Adult Psychiatric Support Services Clinic in
Sacramento.  [Exh. 8F/1 (AR at 439).]

of carrying out his activities of daily living including living alone, keeping up his condo and getting to his appointments," and the record showed Plaintiff was "stable for some time and improving." [Id.]

The ALJ considered Plaintiff's subjective statements and testimony about his auditory hallucinations and the evidence regarding Plaintiff's paranoia about authority – which was focused on law enforcement – and found they did not require significant limitations on interactions with supervisors and co-workers. [Id. at 28-29.] The ALJ also considered the evidence that Plaintiff required breaks to deal with his symptoms, but found:

> there is also no evidence that he is unable to complete the tasks that he engages in at the tattoo shop where he has a regular presence, or carry out the usual activities of daily living. The record as a whole is not persuasive in demonstrating the claimant would require more than the usual breaks typically allotted during an 8-hour workday. The claimant was earning A's in college when he was being treated the [sic] EDAPT clinic, and after moving to Hawaii, he has been managing most of his own activities of daily living, and reports his symptoms are better. According to Dr. Marks's report, the claimant, without assistance, "can take care of most daily activities including personal grooming, cooking, housework and laundry, shopping, managing his own money, travel around the city and take care of his medical needs." [Ex. 2F] Testimony by the claimant and his father also indicate the claimant continues to take care of his basic activities of living, like personal hygiene, cleaning his apartment and is independent in getting from place to place. In addition, the claimant was able to complete psychological testing and the

> consultative mental health evaluation, and there
> is no consistent evidence of significant
> inattentiveness or lack of focus during the
> consultative evaluation or during his treatment
> sessions. Dr. Marks noted the claimant only
> occasionally needed instructions repeated. The
> treatment records also indicate minimal symptoms,
> and in recent years, the mental status exams
> reveal no detectable hallucinations, and no need
> for psychotropic medication.

[Id. at 29.] Thus, the ALJ found the medical records and other evidence supported the RFC finding.

The ALJ found Plaintiff had past relevant work as a cashier II, Dictionary of Occupational Titles ("DOT") § 211.462-010, which is unskilled (SVP 2)[20] and involves light exertion. The ALJ found that, based on the VE's testimony and Plaintiff's "significant nonexertional restrictions," Plaintiff could not return to his past relevant work. [Id. at 29-30.]

As to step five, on the date of the SSI application, Plaintiff was "a younger individual age 18-49," had at least a high school degree, and was able to communicate in English.[21]

---

[20] "SVP" refers to "specific vocational preparation." See 20 C.F.R. § 404.1568(a). SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Dep't of Labor, Dictionary of Occupational Titles ("DOT") at App'x C - Components of the Definition Trailer (4th ed., rev. 1991). A level two SVP is "[a]nything beyond short demonstration up to and including 1 month." Id.

[21] The ALJ noted skills transferability was not an issue because Plaintiff's past relevant work was unskilled. [Decision, AR at 30.]

[Id. at 30 (citing 20 CFR 416.963, 416.964).] In light of these
factors, Plaintiff's RFC, and the Medical-Vocational Guidelines
(20 C.F.R. Part 404, Subpart P, Appendix 2), the ALJ found
Plaintiff could perform jobs "that exist in significant numbers
in the national economy." [Id. (citing 20 CFR 416.969,
416.969(a)).] The ALJ acknowledged Plaintiff's nonexertional
limitations eroded the available occupational base, but the VE
testified an individual with Plaintiff's age, education, work
experience, and RFC could perform the following occupations:

> photo machine operator, which involves, per DOT
> section 207.265-014, unskilled (SVP 2) light
> exertion and is available in numbers of
> approximately 25,7000 nationally; cleaner
> (housekeeper), which involves, per DOT
> 323.687-014, unskilled (SVP 2) light exertion and
> is available in numbers of approximately 245,900
> nationally; and tender for can filling machine,
> which involves, per DOT section 529.685-282,
> unskilled (SVP 2) light exertion and is available
> in numbers of approximately 28,300 nationally.

[Id.] The ALJ also found the VE's testimony was consistent with
the DOT. [Id.] The ALJ therefore found Plaintiff could return
"to other work that exists in significant numbers in the national
economy," and, as of the date of the SSI application, Plaintiff
was not disabled under the Social Security Act. [Id. at 31.]

In the instant Appeal, Plaintiff argues the ALJ erred
in disregarding and/or rejecting his testimony, as well as the
testimony or statements by his parents, Dr. Koike (his uncle),
and Ms. Sucher (the tattoo shop owner) about his need to take

breaks throughout the day at the tattoo shop and his need for at least one day off per week.

## I.    Review of Social Security Decisions

The Ninth Circuit conducts a de novo review of a district court's order in a social security appeal. <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1098 (9th Cir. 2014). Thus, in reviewing the Commissioner's decision, this Court applies the same standards the Ninth Circuit applies.

A court will only disturb the Commissioner's decision if it is not supported by substantial evidence or if it is based on legal error. <u>Id.</u> "Substantial evidence is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Hill v. Astrue</u>, 698 F.3d 1153, 1159 (9th Cir. 2012) (citation and internal quotation marks omitted).  In reviewing a decision by the Commissioner, a district court must consider the entire record as a whole. <u>Id.</u> Where the inferences reasonably drawn from the record would support either affirmance or reversal, the district court may not substitute its judgment for the ALJ's. <u>Molina v. Astrue</u>, 674 F.3d 1104, 1110-11 (9th Cir. 2012).  To ensure a court does not substitute its judgment for the ALJ's, it must "'leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve

21

ambiguities in the record.'" Brown-Hunter v. Colvin, 806 F.3d

487, 492 (9th Cir. 2015) (quoting Treichler, 775 F.3d at 1098).

## II. **Five-Step Analysis**

The following analysis applies in cases involving

review of the denial of social security disability benefits.

> For purposes of the Social Security Act, a
> claimant is disabled if the claimant is unable "to
> engage in any substantial gainful activity by
> reason of any medically determinable physical or
> mental impairment which can be expected to result
> in death or which has lasted or can be expected to
> last for a continuous period of not less than 12
> months." 42 U.S.C. § 423(d)(1)(A). In order to
> determine whether a claimant meets this
> definition, the ALJ employs a five-step sequential
> evaluation. Parra v. Astrue, 481 F.3d 742, 746
> (9th Cir. 2007); 20 C.F.R. §§ 404.1520(a),
> 416.920(a). In brief, the ALJ considers whether a
> claimant is disabled by determining: (1) whether
> the claimant is "doing substantial gainful
> activity"; (2) whether the claimant has a "severe
> medically determinable physical or mental
> impairment" or combination of impairments that has
> lasted for more than 12 months; (3) whether the
> impairment "meets or equals" one of the listings
> in the regulations; (4) whether, given the
> claimant's "residual functional capacity," the
> claimant can still do his or her "past relevant
> work"; and (5) whether the claimant "can make an
> adjustment to other work." 20 C.F.R.
> §§ 404.1520(a), 416.920(a). The claimant bears
> the burden of proof at steps one through four.
> Parra, 481 F.3d at 746.

Molina, 674 F.3d at 1110. If the analysis reaches step five, the

burden shifts to the Commissioner to prove the claimant can

perform other work. Garrison v. Colvin, 759 F.3d 995, 1011 (9th

Cir. 2014).

<u>**DISCUSSION**</u>

**I.    Whether Plaintiff is Capable of**
**      <u>Working Five Eight-Hour Days per Week</u>**

The dispositive issue in the Appeal is whether the ALJ erred in disregarding evidence that Plaintiff requires one day off during the work week due to the effects of his schizophrenia. No party disputes the ALJ's findings that this impairment is severe and that this impairment could reasonably be expected to cause the symptoms Plaintiff has described.  [Decision, AR at 18, 21.]  Thus, the dispute in this Appeal centers around the ALJ's rejection of Plaintiff's evidence regarding the "intensity, persistence and limiting effects of these symptoms."  [<u>Id.</u> at 22.]

Plaintiff testified he has good days and bad days.  He has bad days at least once a week and, on those days, he either does not go into the tattoo shop at all or he does not stay a whole eight-hour day.  [7/8/15 Hrg. Trans., AR at 60.[22]] According to Ms. Sucher, Plaintiff "decides when he comes in, and when he leaves."  [AR at 295.]  Plaintiff's father testified that Plaintiff "does show up three or four days a week to work" at the tattoo shop.  [7/8/15 Hrg. Trans., AR at 63.]  In a letter to the ALJ, Plaintiff's mother, Anna Schuyler, stated:

---

[22] The 7/8/15 Hearing Transcript is AR pages 37-78.  AR at 44-61 is Plaintiff's testimony; AR at 62-70 is the testimony of Plaintiff's father; and AR at 70-76 is the VE's testimony.

> [Plaintiff] has episodes when he is overtaken by
> agitation and unwelcomed thoughts.  By the next
> day he cannot remember exactly what happened,
> saying things like "I think I was psychotic and
> spent the day pacing and sweeping floors".  When
> experiencing an increase in these symptoms
> [Plaintiff] physically isolates himself so as not
> to disturb others.

[AR at 292.]  In his email correspondence with Rob, Plaintiff stated that, on days when he is particularly agitated and "really feeling the symptoms, . . . "[s]ometimes sitting/lying/standing there and breathing isn't enough, [he] need[s] a more violent motion to feel better," such as "[r]unning, sprinting, boxing, somersaults, swimming," or wrestling.  [AR at 286.]  These are not activities Plaintiff could undertake during brief breaks in a typical eight-hour work day.

Although the ALJ's Decision notes Plaintiff's position that he needs one day off during the work week due to the effects of his schizophrenia, see, e.g., Decision, AR at 25, the Decision does not contain an analysis of this issue.  However, by declining to include this limitation in Plaintiff's RFC, the ALJ effectively found that Plaintiff did not require one day off per week and disregarded the evidence Plaintiff presented in support of this limitation.  See id., AR at 20-29.  The evidence Plaintiff offered came from himself and from lay witnesses.  As to whether the ALJ properly rejected Plaintiff's testimony, the following standard applies:

> "First, the ALJ must determine whether the
> claimant has presented objective medical evidence
> of an underlying impairment." [Treichler, 775
> F.3d] at 1102, *quoting* Lingenfelter v. Astrue, 504
> F.3d 1028, 1036 (9th Cir. 2007). Then, if such
> evidence is introduced and "the ALJ has not
> determined that the claimant is malingering, the
> ALJ must provide 'specific, clear and convincing
> reasons for' rejecting the claimant's testimony
> regarding the severity of the claimant's
> symptoms." Id., *quoting* Smolen v. Chater, 80 F.3d
> 1273, 1281 (9th Cir. 1996).[23]

Leon v. Berryhill, 880 F.3d 1041, 1046 (9th Cir. 2017). The

Ninth Circuit has also stated:

> Lay testimony as to a claimant's symptoms or
> how an impairment affects the claimant's ability
> to work is competent evidence that the ALJ must
> take into account. Nguyen v. Chater, 100 F.3d
> 1462, 1467 (9th Cir. 1996); Dodrill v. Shalala, 12
> F.3d 915, 919 (9th Cir. 1993). We have held that
> competent lay witness testimony "cannot be
> disregarded without comment," Nguyen, 100 F.3d at
> 1467, and that in order to discount competent lay
> witness testimony, the ALJ "must give reasons that
> are germane to each witness," Dodrill, 12 F.3d at
> 919. We have not, however, required the ALJ to
> discuss every witness's testimony on a
> individualized, witness-by-witness basis. Rather,
> if the ALJ gives germane reasons for rejecting
> testimony by one witness, the ALJ need only point
> to those reasons when rejecting similar testimony
> by a different witness. See Valentine [v. Comm'r
> Soc. Sec. Admin.], 574 F.3d [685,] 694 [(9th Cir.
> 2009)] (holding that because "the ALJ provided
> clear and convincing reasons for rejecting [the
> claimant's] own subjective complaints, and because
> [the lay witness's] testimony was similar to such
> complaints, it follows that the ALJ also gave
> germane reasons for rejecting [the lay witness's]
> testimony"). The applicable regulations are in
> accord; they require the ALJ to consider testimony

---

[23] Smolen has been superseded on other grounds by 20 C.F.R.
§ 416.929.

> from family and friends submitted on behalf of the
> claimant, <u>see</u> 20 C.F.R. §§ 404.1529(c)(3),
> 404.1545(a)(3), but do not require the ALJ to
> provide express reasons for rejecting testimony
> from each lay witness, <u>see</u> <u>id.</u>; <u>see also</u>
> SSR 06-03p (recognizing that "there is a
> distinction between what an adjudicator must
> consider and what the adjudicator must explain in
> the disability determination or decision").

<u>Molina v. Astrue</u>, 674 F.3d 1104, 1114 (9th Cir. 2012) (some

alterations in <u>Molina</u>).

Although ALJ found Plaintiff's testimony about the

intensity, persistence, and limiting effects of his symptoms to

be only "partly credible," [Decision, AR at 22,] the ALJ did not

make a finding that Plaintiff was malingering. The ALJ

essentially found that Plaintiff's medical records and the

opinions of the examining physicians and reviewing physicians did

not support a restriction that Plaintiff had to have one day off

during a work week. Dr. Pien is Plaintiff's treating physician

for his schizophrenia. "By rule, the Social Security

Administration favors the opinion of a treating physician over

non-treating physicians." <u>Orn v. Astrue</u>, 495 F.3d 625, 631 (9th

Cir. 2007) (citing 20 C.F.R. § 404.1527). Throughout his

treatment of Plaintiff, Dr. Pien noted Plaintiff's desire to

return to work, his efforts to find a job, and that he was doing

well in his "job" at the tattoo shop. <u>See, e.g.</u>, AR at 358 (note

of 9/2/11 initial psychiatric evaluation, stating Plaintiff was

"looking for work in the retail sector"); AR at 350 (note of

1/15/13 psychotherapy session, stating Plaintiff "report[ed] applying for about 5 part time retail jobs last month"); AR at 349 (note of 3/15/13 psychotherapy session, stating Plaintiff had not secured a job yet, but is "more confident about being able to hold a job" and "[p]lans to resume search soon"); AR at 380 (note of 9/27/13 psychotherapy session, stating Plaintiff had been "[w]orking full time since around May 2013" at the tattoo shop and was "[d]oing well there"); AR at 378 (note of 1/23/14 session, stating Plaintiff was "[f]unctioning well full time at job"); AR at 435 (note of 2/26/15 session, stating Plaintiff was "[l]earning a lot of skills, knowledge while volunteering for tattoo shop" and he "[h]opes to get a job w/benefits using this education"); AR at 432 (note of 5/21/15 psychotherapy session, stating Dr. Pien and Plaintiff "[d]iscussed job options he might consider").

Plaintiff's efforts to try to reenter the work force are commendable, but have been largely unsuccessful. The only fruit of those efforts has been Plaintiff's volunteer position at the tattoo shop. The ALJ recognized that Plaintiff was spending approximately thirty two hours per week volunteering at the tattoo shop, see, e.g., Decision, AR at 17, 27, *i.e.* Plaintiff has been taking approximately one day per week off. The ALJ found the volunteer position did not constitute substantial gainful activity. [Id. at 17.] Ms. Sucher described the tasks

Plaintiff performed at the tattoo shop as "sometimes tak[ing] it upon himself to do something like vacuuming" or "going to retrieve something someone needs," but "[h]is primary task . . . is just being in the shop as a friend." [AR at 295.]

Although the Decision does not address the ALJ's rejection of the evidence regarding Plaintiff's need to take a day off, in rejecting the evidence regarding the extent of the breaks Plaintiff needed during a work day, the ALJ stated "[t]reating psychiatrist, Dr. Pien, also made no mention of easy distractability, psychomotor agitation or restlessness, and instead, regularly indicated the claimant was well oriented, cooperative and displayed grossly intact concentration and attention." [Decision, AR at 27.] However, it should also be noted that, in spite of their repeated discussion of Plaintiff's efforts to secure a job, Dr. Pien does not opine on the issue of whether Plaintiff has the capacity and ability to work a forty-hour work week, or to maintain any type of paid employment. Dr. Pien was not required to evaluate Plaintiff's ability to work because the purpose of his sessions with Plaintiff was not employment-based. That also means Dr. Pien's comments about Plaintiff's focus and attention during their sessions should not equate to findings regarding Plaintiff's ability to work. Further, Dr. Pien's sessions were relatively brief, and the fact that Plaintiff was able to stay on track during those sessions

28

does not necessarily indicate Plaintiff could sustain that same level of focus and attention at a job over the course of a forty-hour work week.  <u>See, e.g.</u>, AR at 350 & 380 (twenty-minute sessions); AR at 432 (sixteen-minute session).

Thus, neither Plaintiff's work at the tattoo shop nor Dr. Pien's observations about Plaintiff's efforts to secure employment constitute either: 1) specific, clear and convincing reasons to reject Plaintiff's testimony about the severity of his symptoms; or 2) germane reasons to support the ALJ's rejection of the lay evidence submitted regarding Plaintiff's need for one day off per week.

On July 2, 2013, Plaintiff underwent a consultive examination by William Marks, Ph.D.  Dr. Marks prepared a Department of Human Resources Bureau of Disability Adjudication physician's report ("Marks Report"), which was "for the sole purpose of social security services."  [AR, Exh. 2F (Marks Report) at 361.]  Thus, he specifically evaluated Plaintiff to determine if Plaintiff had the ability to work.  Dr. Marks opined:

> Mr. Schuyler is capable of understanding simple
> work instructions presented in verbal and written
> form.  His reading and functional mathematic
> skills appear adequate at this time.  Regarding
> negative impact from mental health difficulties,
> Mr. Schuyler **may have some difficulty maintaining
> regular employment attendance** on a consistent
> basis as evident from past work performance.  He
> appears capable of simple repetitive work tasks
> under ordinary supervision; however, **his mental**

> **health condition may negatively impact consistent
> work performance**.  His responses during the
> interview suggest poor interpersonal skills to
> work well with others on a consistent basis.  He
> appears to have difficulty suspecting others of
> exploiting or deceiving him, feels others are
> trying to influence him, has difficulty listening
> to authority, trusting educational systems, and is
> often suspicious and untrusting of others.  He
> would benefit from working with others who
> understand his difficulties, offer minimal
> contact, and are willing to work with him in
> resolving his concerns.  Regarding negative impact
> from mental health difficulties, he appears able
> to adapt to a low-demand, entry-level job, but **may
> have difficulty on a consistent basis, negatively
> impacted from his mental health conditions**.  With
> successful treatment of schizophrenia, the
> prognosis would be a guarded positive prediction.

[AR at 368-69 (emphases added).]  Dr. Marks's opinion that

Plaintiff would have difficulty maintaining consistent job

attendance and performance is consistent with Plaintiff's

testimony about the severity of his symptoms and with the lay

testimony regarding Plaintiff's need for a day off during a work

week.  However, the ALJ discounted Dr. Marks's opinion because

such limitations were "not clearly evident during the evaluation

with Dr. Marks" and because of "other evidence showing

[Plaintiff] has continued to improve."  [Decision, AR at 26.]

The ALJ gave more weight to Dr. Pien's findings, "whose records

. . . describe [Plaintiff] to be consistently stable and

improving, as supported by the claimant's activities of daily

living and the testimony at the hearing."  [Id. at 27.]

It is true that, "[g]enerally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." Orn, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)). Dr. Pien is Plaintiff's treating psychiatrist, while Dr. Marks was an examining psychologist. However, as previously noted, Dr. Pien did not opine on Plaintiff's ability to work. Thus, his clinical observations cannot be said to directly contradict Dr. Marks's findings about Plaintiff's ability to work. The ALJ disregarded Dr. Marks's findings about Plaintiff's ability to work as contrary to Dr. Pien's statements about Plaintiff's ability to perform activities of daily living and Dr. Pien's statements about Plaintiff's general improvements in his condition. This was legal error.

First, a claimant's ability to perform activities of daily living are only relevant to the credibility of his claimed limitations if the activities of daily living are inconsistent with those limitations. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (stating the Ninth Circuit has "recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations" (some citations omitted) (citing Cooper v. Bowen, 815 F.2d 557, 561

(9th Cir. 1987) (noting that a disability claimant need not

"vegetate in a dark room" in order to be deemed eligible for

benefits); <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989)

("Many home activities are not easily transferable to . . . the

more grueling environment of the workplace, where it might be

impossible to periodically rest or take medication."))).

Plaintiff lives in a condominium owned by his parents.

His father testified Plaintiff "[t]akes real good care of his

living quarters" and "keep[s] the place immaculately clean almost

excessive-compulsive." [7/8/15 Hrg. Trans., AR at 67.]

Plaintiff is able to take care of his personal hygiene and cook

for himself, but Plaintiff "has to kind of force himself to

remember to eat on occasion." [<u>Id.</u>] He is able to keep

appointments with frequent reminders from his father. Because of

his paranoia, Plaintiff generally will not open his mail or check

his phone messages. His father has to go through them with him.

[<u>Id.</u> at 68; AR at 292 (letter to the ALJ from Plaintiff's

mother).] Plaintiff's parents give him a monthly stipend, and he

is able to make it last through the month, but his father

testified, "financially pretty much I have to guide him through."

[7/8/15 Hrg. Trans., AR at 68.] These activities of daily living

are consistent with Plaintiff's claimed limitations. Plaintiff's

activities of daily living do not constitute either: 1) specific,

clear and convincing reasons to reject Plaintiff's testimony

about the severity of his symptoms; or 2) germane reasons to support the ALJ's rejection of the lay evidence submitted regarding Plaintiff's need for one day off per week.

Dr. Pien did note improvement that Plaintiff made over time. See, e.g., AR at 379 (note of 12/12/13 session, stating Plaintiff's "social and occupational functioning gradually improving" and that he was "[c]oping w/symptoms better and better"). However,

> such observations must be "read in context of the overall diagnostic picture" the provider draws. Holohan [v. Massanari], 246 F.3d [1195,] 1205 [(9th Cir. 2001)]; cf. Lester v. Chater, 81 F.3d 821, 833 (9th Cir. 1995) ("Occasional symptom-free periods . . . are not inconsistent with disability."). The fact that a person suffering from depression makes some improvement "does not mean that the person's impairment [] no longer seriously affect[s] [his] ability to function in a workplace." Holohan, 246 F.3d at 1205; see also Ryan [v. Comm'r of Soc. Sec.], 528 F.3d [1194,] 1200-01 [(9th Cir. 2008)].

Ghanim v. Colvin, 763 F.3d 1154, 1162 (9th Cir. 2014) (some alterations in Ghanim). While Dr. Pien did note some improvement in Plaintiff's condition, nothing in the overall diagnostic picture he draws disproves Dr. Marks's opinion that Plaintiff would have difficulty maintaining consistent work attendance and performance. Further, Dr. Marks's opinion is supported by the evidence in record regarding Plaintiff's volunteer work at the tattoo shop, the testimony by Plaintiff and his father, and the letter submitted by Plaintiff's mother. Dr. Pien's statements

about Plaintiff's improvement do not constitute either:
1) specific, clear and convincing reasons to reject Plaintiff's
testimony about the severity of his symptoms; or 2) germane
reasons to support the ALJ's rejection of the lay evidence
submitted regarding Plaintiff's need for one day off per week.

The ALJ also noted Plaintiff did not need breaks during
Dr. Marks's evaluation. [Decision, AR at 27.] While the Marks
Report does not state Plaintiff required breaks during the
evaluation, a consultive evaluation is a single event, and the
fact that Plaintiff did not need a break during the evaluation
does not necessarily show he could complete a standard eight-hour
work day with only the standard break periods. Further,
Dr. Marks opined, based on his review of Plaintiff's history and
his observations of Plaintiff during the evaluation, that
Plaintiff may have difficulty maintaining consistent work
attendance and performance. This is consistent with Plaintiff's
position that he would only be capable of work if he is able to
have one day off per week to manage his symptoms. The ALJ
committed legal error in disregarding Dr. Marks's opinion.

Finally, as to the ALJ's reliance on the opinions of
the State Psychological Consultants and Dr. Gordy, they were
merely reviewing physicians, and their opinions are generally
entitled to less weight than Dr. Marks's. See Orn, 495 F.3d at
631. Dr. Gordy filled out Social Security Administration forms

34

and provided limited analysis.  [AR, Exh. 11F.]  Dr. Gordy
ultimately opined that Plaintiff could perform simple, repetitive
work, interact with co-workers, and have limited interaction with
supervisors.  However, in support of these opinions, Dr. Gordy
cited Plaintiff's thirty-two-hour-per-week volunteer position.
[AR at 472.]  The State Psychological Consultants also noted
Plaintiff's work at the tattoo shop and Dr. Pien's observation of
gradual improvement in Plaintiff's condition.  [AR at 98.]  As
previously noted, Dr. Pien's statements about the improvement of
Plaintiff's condition are not probative of Plaintiff's ability to
work a forty-hour work week.  Further, Plaintiff's ability to
hold his volunteer position at the tattoo shop, with its unique
duties and schedule, does not prove that he could work a
traditional forty-hour per week job.  Even Ms. Sucher stated
that, as much as she and her staff enjoy having Plaintiff at the
tattoo shop, she "would not recommend [Plaintiff] participate in
regular employment, because [she] just do[es] not see that he is
able at this time."  [AR at 295.]

        Thus, the ALJ committed legal error because: 1) the
ALJ's rejection of Plaintiff's testimony regarding the severity
of his symptoms was not supported by specific, clear and
convincing reasons; and 2) the ALJ's rejection of the lay
evidence submitted regarding Plaintiff's need for one day off per
week to manage his symptoms was not supported by germane reasons.

The record is fully developed on the issue of whether Plaintiff requires one day off per week, and this Court concludes that further proceedings on the issue are not necessary. The evidence that Plaintiff requires one day off during the work week is therefore deemed credible as a matter of law. See Treichler, 775 F.3d at 1100-01 (discussing the analysis under the "credit-as-true" rule).[24]

## II.  Harmless Error

During the VE's testimony, the ALJ described a hypothetical worker with Plaintiff's characteristics and the limitations that the ALJ ultimately included in the RFC. [7/8/15 Hrg. Trans. at 71.]  The VE testified that, if the hypothetical worker also required one day off per week, there would be no jobs he could do.  [Id. at 73.]  Based on the VE's testimony, the ALJ's error in rejecting the evidence that Plaintiff requires one day off in a work week was not harmless.  See Treichler, 775 F.3d at 1099 ("An error is harmless if it is 'inconsequential to the ultimate nondisability determination.'" (quoting Alaska Dep't of Envtl. Conserv. v. EPA, 540 U.S. 461, 497, 124 S. Ct. 983, 157 L. Ed. 2d 967 (2004))).

In light of this Court's rulings, the ALJ's ultimate ruling that Plaintiff was not disabled was not supported by

---

[24] The "credit-as-true" rule is also referred to as the Varney rule, from Varney v. Secretary of Health & Human Services, 859 F.2d 1396 (9th Cir. 1988).

substantial evidence. It is not necessary for this Court to reach the other arguments raised in Plaintiff's Appeal, and this Court makes no findings or conclusions as to those other argument. Plaintiff's Appeal is granted insofar as the ALJ's ruling that Plaintiff is not disabled is reversed.

## III. <u>Remand</u>

The Ninth Circuit has stated,

> when "the record before the agency does not support the agency action, . . . the agency has not considered all relevant factors, or . . . the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744, 105 S. Ct. 1598, 84 L. Ed. 2d 643 (1985). The Supreme Court has referred to this remand requirement as the "ordinary 'remand' rule." <u>Gonzales v. Thomas</u>, 547 U.S. 183, 185, 126 S. Ct. 1613, 164 L. Ed. 2d 358 (2006) (internal quotation marks omitted).

<u>Id.</u> (alterations in <u>Treichler</u>). The ordinary remand rule applies in social security cases. <u>Id.</u> The Ninth Circuit will "generally remand for an award of benefits only in rare circumstances, where no useful purpose would be served by further administrative proceedings and the record has been thoroughly developed." <u>Id.</u> at 1100 (citations and internal quotation marks omitted).

Because the elements of the credit-as-true rule are satisfied in this case, it presents "the 'rare circumstances'

that allow us to exercise our discretion to depart from the
ordinary remand rule." Id. at 1101.

> Of course, even when those "rare circumstances"
> are present, "[t]he decision whether to remand a
> case for additional evidence or simply to award
> benefits is in our discretion," Swenson v.
> Sullivan, 876 F.2d 683, 689 (9th Cir. 1989). See,
> e.g., Harman v. Apfel, 211 F.3d [1172,] 1178 [(9th
> Cir. 2000)] (holding that the exercise of
> authority to remand for benefits "was intended to
> be discretionary and should be reviewed for abuse
> of discretion"). We have frequently exercised our
> discretion to remand for further proceedings,
> rather than for benefits. See Connett v.
> Barnhart, 340 F.3d 871, 874–76 (9th Cir. 2003)
> (citing cases and reaffirming that the reviewing
> court retains discretion to remand for further
> proceedings even when the ALJ fails "to assert
> specific facts or reasons to reject [the
> claimant]'s testimony"); see also Garrison, 759
> F.3d at 1021 (noting that a district court retains
> the flexibility to "**remand for further proceedings
> when the record as a whole creates serious doubt
> as to whether the claimant is, in fact, disabled
> within the meaning of the Social Security Act.**").

Id. at 1101-02 (some alterations in Treichler) (emphasis added)
(footnotes omitted).

Viewing the record as a whole and in light of this
Court's rulings, there are no serious doubts as to whether
Plaintiff is or is not disabled. This Court, in the exercise of
its discretion, concludes that further proceedings are not
necessary and remands the case to the ALJ for the determination
and award of benefits.

## CONCLUSION

On the basis of the foregoing, Plaintiff's appeal of the Administrative Law Judge's October 15, 2015 Decision is HEREBY GRANTED insofar as the ALJ's Decision is REVERSED and the case is REMANDED to the ALJ for the determination and payment of benefits.

There being no remaining issues in this case, the Court DIRECTS the Clerk's Office to enter judgment and close the case immediately.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, September 21, 2018.



  /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

SEAN PHILIP SCHUYLER VS. NANCY A. BERRYHILL, ETC; CIVIL 17-00277 LEK-KSC; ORDER GRANTING PLAINTIFF'S APPEAL AND REVERSING THE ADMINISTRATIVE LAW JUDGE'S OCTOBER 15, 2015 DECISION